IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 22, 2008 Session

## In the Matter of: K.H., S.F., A.F., & W.F.,

## TARRA HOWELL AND DENNIS LEE MOODY
v.
## TANYA DEE BALLARD AND JOHNNY FREEMAN

Appeal from the Juvenile Court for Madison County
No. 45-39,883    Christy R. Little, Judge

No. W2008-01144-COA-R3-PT - Filed May 15, 2009

This case involves the termination of parental rights. The mother has a history of criminal activity and past incarcerations, including one for facilitation of murder, and is currently incarcerated. Between incarcerations, the mother lived with her boyfriend, the father of the two youngest of the mother's five children. The mother's boyfriend is incarcerated for raping and sexually abusing the mother's two oldest daughters. With both the mother and her boyfriend incarcerated, the mother's sister obtained custody of the children and filed this petition to terminate the mother's parental rights. The trial court terminated the mother's parental rights, finding several grounds for termination and that termination was in the best interest of the children. The mother appeals, arguing that the termination order did not satisfy the statutory requirements, that the trial court erred in finding that grounds for termination exist, and that termination of the mother's parental rights is not in the best interest of the children. We find that the trial court's order, while less than optimal, satisfies the requirements of the statute as to one ground for termination. As to that ground, clear and convincing evidence supports the trial court's finding, as well as the finding that termination of the mother's parental rights is in the children's best interest. Therefore, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Lanis L. Karnes, Jackson, Tennessee, for the Respondent/Appellant Tanya Dee Ballard.

Betty Stafford Scott and Mary Jo Middlebrooks, Jackson, Tennessee, for the Petitioner/Appellee Tarra Howell.

# OPINION

## FACTS AND PROCEDURAL HISTORY

This appeal involves children who were subjected to substantial abuse, and is complicated by inadequacies in the trial court's final order. At issue are the parental rights of Respondent/Appellant Tanya Dee Ballard ("Mother"), the biological mother of five daughters. On March 23, 2007, Mother's sister, Petitioner/Appellee Tarra Howell ("Aunt"), filed this petition to terminate Mother's parental rights to four of her five children,[1] namely, daughters K.H. (born 9/20/90), S.F. (born 1/24/01), A.F. (born 12/20/01), and W.F. (born 1/27/04).[2]

After growing up in an abusive house,[3] Mother gave birth to K.H. when she was fourteen years old. She lived with her mother ("Grandmother") until her second daughter T.H. (born 8/4/92) was about nine months old. Mother eventually moved back in with Grandmother, then moved out again shortly before she turned eighteen. Mother then married Ronald "Boo" Ballard, to whom she is still legally married.

Mother's long history of criminal activity began at a young age. During her troubled childhood she had a series of juvenile offenses. In April 1995, when she was approximately eighteen, she pled guilty to twenty-four counts of forgery, for which she received a ten year sentence to be served in Community Corrections. A year later, her Community Corrections supervision was revoked and Mother went to jail. In 1999, Mother pled guilty to an offense stemming from an incident that occurred in 1994. In 1994, Mother's husband "Boo" Ballard murdered a mentally challenged woman, and disposed of her body in the woods. For her participation in the offense Mother pled guilty to facilitation of second degree murder. For the facilitation conviction, she received an eight year sentence. Ultimately, the sentences for both forgery and facilitation were suspended and Mother was released and placed on probation.

After her release from prison, Mother gave birth to S.F. in January 2001 and A.F. in December 2001. Although she was still married to "Boo" Ballard, Mother was living with A.F.'s father, Johnny Freeman.

During this time, Mother's two oldest daughters, K.H. and T.H., remained living in the home shared by Grandmother and Aunt and visited with Mother occasionally. Mother talked to K.H. and

---

[1] The petition also sought to terminate the parental rights of Johnny Freeman, who is the biological father of A.F. and W.F. and is listed as the father on the birth certificate of S.F. Freeman did not contest the termination of his parental rights, and raises no issue on appeal.

[2] K.H. and S.F. are not at issue in this appeal. K.H. has reached majority since the trial court terminated Mother's parental rights to her. As to S.F., the termination proceedings have been held in abeyance and Mother's parental rights to her were not terminated; S.F. was in state custody, living in a therapeutic foster home when the trial court entered its final order. Mother has another daughter T.H. (born 8/4/92), who lives with her father (not Freeman), and was not a subject of the termination proceedings.

[3] Mother's father sexually abused at least one daughter.

T.H. about coming to live with her in Johnny Freeman's home, along with Mother's two younger daughters. In April 2003, K.H. and T.H. moved in with Mother and Freeman, when K.H. and T.H. were twelve and ten years old, respectively. They would stay there over a year. During this time, in January 2004, the youngest daughter, W.F., was born. In mid 2004, Mother was again arrested, this time for selling a controlled substance; she had her daughters in the car with her at the time. After that, the two oldest daughters, K.H. and T.H. went to live with Grandmother and Aunt.[4] Because Freeman was listed as the biological father of the younger three daughters, they continued to live with him.

After leaving Freeman's home, K.H. became afraid for her younger sisters, and finally disclosed to Mother's sister Misty that Freeman had sexually abused her and her sisters the entire time that K.H. and T.H. lived with Mother and Freeman. The authorities were contacted, and Freeman was arrested in October 2004. Freeman was eventually convicted of sexual battery, aggravated sexual battery, rape, and rape of a child; he received a twenty-five year prison sentence. Thereafter, T.H. lived with her father, and Mother's four remaining daughters, K.H., S.F., A. F., and W.F., were in Aunt's custody, living in the home with Grandmother and Aunt.

On July 18, 2005, Mother pled guilty to the delivery and/or sale of a schedule III controlled substance, for which she received a sentence of twelve years, to be served with the Tennessee Department of Corrections. Mother's probation for her prior convictions was revoked, and she was incarcerated in Memphis.

In March 2007, Aunt, as the prospective adoptive parent, filed the instant petition seeking termination of the parental rights of Mother as well as Freeman, who is the biological father of A.F. and W.F., and is listed as the father on the birth certificate of S.F. Dennis Lee Moody, who was presumed to be the biological father of K.H. but is not listed on her birth certificate, joined in the petition, seeking to have his parental rights voluntarily terminated. Mother asserted that Moody was not the biological father of K.H. and that Freeman was not the biological father of S.F. The unknown fathers were served by publication in the Jackson Sun newspaper. Mother later testified that Eric Brown is the biological father of S.F. and that Danny Scott is the biological father of K.H. Danny Scott signed and filed a waiver of interest as to K.H., consenting to the termination of his parental rights. Eric Brown could not be located for personal service, and notice of the petition as to him was publicized in the Bulletin Times newspaper in Bolivar.

The case proceeded to trial on the termination of Mother's parental rights. The trial testimony revolved primarily around the girls' living environment during the 1-2 year period in which they resided with Mother and Freeman. The trial was held on July 10, 2007, and January 22, 2008. At the time of trial, Mother was still incarcerated in Memphis; however, she was brought to the courtroom to participate in the trial.

---

[4]K.H. and T.H. were initially placed in Grandmother's custody. After a couple of months, they were transferred to the care of Mother's other sister, Misty Burrow. In April 2005, Aunt was given custody of all five of Mother's daughters. In August 2005, T.H. went to live with her father.

During the course of the trial, the trial court heard testimony from Grandmother, Aunt, Mother's other sister, Misty Burrow, and the social worker who counseled K.H., S.F., and A.F., and the director of the counseling center who participated in the interviews with the children. The trial court heard testimony from the police office who witnessed the forensic interviews with the two oldest daughters, K.H. and T.H., describing the abuse that had occurred in Freeman's home, shared by Mother before her arrest. The officer commented on the level of detail recounted by the oldest daughter, K.H., in her interview, with thorough descriptions of events and physical evidence. When the officer later went to Freeman's home, many of the items K.H. had described were found – Freeman's undergarments, pornographic videotapes, an artificial penis and other sex toys, a beer bottle used as a tool of sexual assault, and the jewelry for Freeman's "Prince Albert" penis piercing.

The centerpiece, however, of the Petitioner's case was the testimony of K.H. While the questions in K.H.'s forensic interview had centered on details of the sexual abuse K.H. and her sisters had suffered at the hands of Freeman, her testimony in the trial court focused on Mother's knowledge of Freeman's abuse, as well as Mother's abuse and neglect of the children. In what could only have been exceedingly difficult circumstances, her testimony was clear and specific.

K.H. said that Mother persuaded her and her sister, T.H., to leave the home with Grandmother and Aunt and go live with Mother, Freeman, S.F., and A.F. by telling them that she had changed, that she loved them, and that she would be the best mother they ever had. They all lived together in a three-bedroom home in Jackson, along with several animals.

In that home, K.H. said, Freeman repeatedly raped and molested her.[5] Some of the incidents occurred when Mother was out of the house with the younger girls, after telling K.H. to stay home with Freeman. Many of the incidents occurred when Mother was in the home; indeed some occurred when K.H., Freeman, and Mother were all in the same bed. Sometimes Mother would look at Freeman with K.H. and then turn over and close her eyes. Other times, Mother would tell the older girls to go into the bedroom with Freeman. K.H. maintained that there was no way that Mother could not have known of Freeman's sexual abuse.

K.H. said that she did not talk to Mother about Freeman's sexual abuse because Mother had said to K.H. and her sister, T.H., that if they ever told her that any man of hers had touched them, that Mother would kill them and their sisters. K.H. said that she believed Mother when she said this, and that she was afraid of Mother. Mother sometimes talked about the woman Boo Ballard murdered; with a smile on her face, Mother would describe hearing the woman's skull crack.

Mother frequently involved her daughters in her sales of illegal drugs. Persons would come to their home to purchase drugs, Mother had the girls count the pills to be sold, and Mother would bring the girls with her for drug transactions. Mother had the children accompany her for drug transactions so that she would not look suspicious.

---

[5] In her forensic interview, K.H. said that Freeman's sexual abuse began the first weekend she and T.H. moved to their home. Each time that he raped her or forced other sexual conduct, Freeman would tell K.H. that if she ever told anybody, he would kill her, her baby sister, and her mother. Freeman then would smile at her.

K.H. recalled Mother's neglect, deprivation, and physical abuse. The house was filthy from Mother permitting the animals and the youngest children to eliminate on the floors of the house. All of the children were permitted to bathe only once a week, and wash clothes once a month. When not at school, the two oldest daughters were expected to fully care for the younger girls, changing diapers, preparing meals, cleaning up after them, potty training them, and getting them to sleep. K.H., then in the sixth grade, had to take care of the younger girls from immediately after school until they finally went to sleep in the wee hours of the morning because Mother permitted the younger girls to sleep all day while K.H. was at school. K.H. would then wake herself up early and get herself to the bus to go to school. K.H. and T.H. were not permitted to eat breakfast before school; they could only have the free breakfast provided at school. Mother and Freeman would grill steaks for themselves, while K.H. and the children ate Ramen noodles and Tuna Helper.

When Mother was angered at K.H. and the other girls, she would have them lay down on the floor, put her foot on their back and strike them repeatedly with pieces of a wooden door frame, about the width of a deck of cards. She called them profane, demeaning names. Mother would burn A.F. with hot water in the bathtub, and when A.F. screamed, Mother would dunk A.F.'s head under the water.

K.H. wanted Mother's parental rights to be terminated, out of concern that "something would happen" to her or her sisters.

Much of K.H.'s testimony was echoed by her younger sister, T.H. In her testimony, T.H. recounted an incident in which Mother walked into the room while Freeman was touching her inappropriately; Mother simply turned around and left the room. Freeman also molested T.H. in the bed shared by Freeman and Mother. T.H. also said that she did not talk to Mother about Freeman's sexual abuse because Mother threatened to kill the girls if any man that she was dating ever touched them. An Hispanic acquaintance would also come to the house, take T.H. to a bedroom and molest her, and give money to Mother, Freeman, and the girls.

T.H. also testified about Mother's involvement in selling illegal drugs, corroborating K.H.'s assertion that Mother sometimes had her daughters count the pills ("hydros") that she was selling, that people would come to their home to purchase pills, and that Mother took the children with her while she sold pills. T.H. described being prohibited from eating breakfast except at school, and eating Tuna Helper while Mother and Freeman grilled steaks for themselves. She said that Mother would strike all of the children, even the youngest, with pieces of wood framing. T.H. also described an incident in which Mother pulled A.F. across the floor of their van by her head.

T.H. corroborated the unclean condition of the home, and that she and K.H. had to clean the house and take care of their younger sisters when they returned home from school. Mother did not care for their younger sisters; rather, K.H. primarily took care of them, and T.H. helped. Because T.H. was living with her father at the time of trial, she was unaffected by the termination proceedings; nevertheless, she did not want her younger sisters returned to Mother's care because she did not "want them going through what we went through."

Mother testified in her own defense. She testified about her abusive childhood and her teenage pregnancies. She described her efforts to keep in touch with her daughters while incarcerated and between incarcerations, and her self-improvement, such as taking Bible courses, parenting classes, and obtaining her G.E.D. She admitted that her children were with her when she was arrested for selling illegal drugs. She admitted "spanking" the children with a piece of door framing, but said that she had learned better in her parenting class. Mother denied any knowledge whatsoever of Freeman's sexual abuse of her daughters. Mother testified that she wanted Aunt to continue to care for the children until she got out of prison and was able to care for them again, so that they would have consistency and stability in their lives.

In her testimony, Aunt said that she was home schooling K.H. because K.H. had panic attacks as a result of the sexual abuse. Aunt also had a job. She hoped to adopt K.H., S.F., A.F., and W.F., and testified that she planned to go back to nursing school after the conclusion of the adoption proceedings.

At the conclusion of the trial, the trial court issued an oral ruling, terminating Mother's parental rights as to K.H., A.F, and W.F. The proceedings as to S.F. were held in abeyance because S.F. was in a therapeutic foster home.

On March 10, 2008, the trial court issued a written order terminating Mother's parental rights. The written order stated in pertinent part:

8. This Court has determined by clear and convincing evidence that [Mother] . . . has admitted to physically abusing these children, failing to support these children and failing to protect these children from Johnny Freeman who plead guilty to child rape. . . .

9. Termination of [Mother's] parental rights to [K.H., A.F., and W.F.] is in the best interest of the child. . . .

* * *

11. The following evidence supporting this finding cumulatively constituted clear and convincing evidence of grounds and determination of the children's best interest:

   A. [Mother] willfully abandoned her children based upon her engagement in conduct prior to incarceration which exhibited a wanton disregard for the children. She admitted to physically exposing her children to illegal drug transactions.

   B. Subsequent to incarceration, [Mother] abandoned her children in her failure to have contact with the children to the extent that an inmate is allowed.

   C. Mother admitted to physically abusing and failing to support her children prior to her incarceration.

   D. The Court found that Mother knowingly failed to protect her children from the admitted sexual abuse of her live-in boyfriend, Johnny Freeman. This failure

-6-

> to protect the children from severe abuse constitutes severe abuse.
>
> * * *
>
> I.  Based upon credible testimony, the Court found that a meaningful relationship has been established between [Aunt] and the children. . . . [Aunt] has consistently provided a stable home environment for these children through the years.

The trial court then ordered that Mother's parental rights as to K.H., A.F., and W.F. be terminated. The order held the termination proceedings regarding S.F. in abeyance because she was in state custody in therapeutic foster care. Mother then filed a timely notice of appeal.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother raises the following issues for our review:

1. Whether the final judgment and termination of parental rights order complied with the statutory requirements.
2. Whether the trial court erred when it found that Mother willfully abandoned her children based upon her engagement in conduct prior to incarceration that exhibited a wanton disregard for the children.
3. Whether the trial court erred when it found that Mother abandoned her children by failing to have contact with the children to the extent that an inmate is allowed.
4. Whether the trial court erred when it found that Mother knowingly failed to protect her children from the admitted sexual abuse of Johnny Freeman, and is therefore guilty of severe child abuse.
5. Whether the trial court erred when it found that it is in the children's best interest to terminate Mother's parental rights.
6. Whether the trial court erred when it found that Aunt had consistently provided a stable home environment for the children.

We review the trial court's specific findings of fact *de novo* on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *see In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). In this case, some of the trial court's factual findings are based on its determinations of the credibility of the witnesses. This Court affords great deference to the trial court's credibility determinations. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995) (citation omitted). We review the trial court's conclusions of law *de novo* without a presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001) (citations omitted).

Because Tennessee Code Annotated § 36-1-113(c)(1) requires a heightened burden of proof in parental termination cases, we must also "determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *In re M.J.B.*, 140 S.W.3d at

654 (citations omitted). Thus, we must "draw a distinction between specific facts and the combined weight of these facts." *Id.* at 654 n.35. The trial court's specific findings of fact are presumed correct, so long as they are supported by a preponderance of the evidence. *Id.* We "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion." *Id.*

## ANALYSIS

In Tennessee, proceedings on the termination of parental rights are governed by statute. To terminate parental rights, two elements must be proven. First, the existence of at least one of the statutory grounds for termination must be shown. T.C.A. § 36-1-113(c)(1) (2005); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Second, it must be proven that terminating the parental rights of the biological parent is in the child's best interest. T.C.A. § 36-1-113(c)(2) (2005); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn. Ct. App. 2003); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Both elements must be proven by clear and convincing evidence. T.C.A. § 36-1-113(c)(1) (2005); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence that meets the clear and convincing standard eliminates any substantial doubts about the correctness of the conclusion drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546.

## Specific Findings of Fact

We first address Mother's argument that the trial court's order terminating her parental rights failed to comply with the statutes governing termination.[6] In particular, we consider the specificity of the trial court's findings of fact and conclusions of law. *See In re Adoption of T.L.H.*, No. M2008-01408-COA-R3-PT, 2009 WL 152475, at *5 (Tenn. Ct. App. Jan. 21, 2009) (citing *In re G.N.S.*, No. W2006-01437-COA-R3-PT, 2006 WL 3626322, at *6 (Tenn. Ct. App. Dec. 13, 2006)).

"Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007) (citing *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999)). Consequently, the trial court is required to make specific findings of fact and conclusions of law on the grounds for termination and whether termination is in the best interest of the child. *See* T.C.A. § 36-1-113(k) (2005); *In re Tiffany B.*, 228 S.W.3d at 156 (citations omitted); *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). Section 36-1-113(k) states as follows: "The court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." This statutory requirement is discussed in some detail in *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524 (Tenn. Ct. App. Nov. 25, 2003):

---

[6]Mother argues that the final order is inadequate because the "order" section of the order does not list the grounds for termination, and the section of the order outlining the court's findings of fact allude to the grounds without specifically citing to the statutory provision. Mother cites no authority in support of this assertion, and we have found nothing which requires that the trial court's findings of fact or conclusions of law be in a specific part of the order.

A trial court's responsibility to make findings of fact and conclusions of law in termination cases differs materially from its responsibility in other civil cases. Generally, trial courts, sitting without juries, are not required to make findings of fact or conclusion of law unless requested in accordance with Tenn. R. Civ. P. 52.01. Termination cases, however, are another matter. Tenn. Code Ann. § 36-1-113(k) explicitly requires trial courts to "enter an order which makes specific findings of fact and conclusions of law" in termination cases. Thus, trial courts must prepare and file written findings of fact and conclusions [of] law with regard to every disposition of a petition to terminate parental rights, whether they have been requested or not.

Tenn. Code Ann. § 36-1-113(k) reflects the Tennessee General Assembly's recognition of the necessity of individualized decisions in these case. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999) (holding that termination cases required "individualized decision making"). It also reflects the General Assembly's understanding that findings of fact and conclusions of law facilitate appellate review and promote the just and speedy resolution of appeals. *Bruce v. Bruce*, 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990). Because of Tenn. Code Ann. § 36-1-113(k), trial courts cannot follow the customary practice of making oral findings from the bench and later adopting them by reference in their final order.

When a trial court has not complied with Tenn. Code Ann. § 36-1-113(k), we cannot simply review the record *de novo* and determine for ourselves where the preponderance of the evidence lies as we would in other civil, non-jury cases. In accordance with *In re D.L.B.*, 118 S.W.3d at ___, 2003 WL 22383609, at *6, we must remand the case for the preparation of appropriate written findings of fact and conclusions of law.

*Id.* at *3 (footnotes omitted). Thus, the requirement that the trial court make specific findings of fact and conclusions of law is not a mere technicality; rather, compliance with Section 36-1-113(k) serves an important purpose. *See White v. Moody*, 171 S.W.3d 187, 191 (Tenn. Ct. App. 2004). "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. April 21, 2004).

The specificity requirement is well illustrated and explained in *In re K.N.R.*, No. M2003-01301-COA-R3-PT, 2003 WL 22999427 (Tenn. Ct. App. Dec. 23, 2003). The *In re K.N.R.* Court quoted the trial court's final termination order in its entirety, and then observed:

An examination of the final order reveals the repetitious restatement of conclusions of law and the repetitious recitations of the statutory grounds; however, there are no findings of fact in the final order, as required by . . . Tenn. Code Ann. § 36-1-113(k), for our review. It must be understood that a recitation in a final order that a parent has "abandoned the child" is a conclusion of law, not a finding of fact. Moreover, placing the statement (abandoned the child) following the popular phrase "the Court therefore finds" does not transform a conclusion of law into a finding of fact.

-9-

***Id.*** at \*4. ***See also L.D.N. v. R.B.W.***, E2005-02057-COA-R3-PT, 2006 WL 369275, at \*4 (Tenn. Ct. App. Feb. 17, 2006); ***In re C.R.B.***, No. M2003-00345-COA-R3-JV, 2003 WL 22680911, at \*4 (Tenn. Ct. App. Nov. 13, 2003). Because the statute speaks in terms of the trial court's "order," we focus on the written order, not the oral rulings issued at the conclusion of the trial.[7] ***See In re Adoption of Muir***, 2003 WL 22794524, at \*3 n.5. If the trial court fails to make sufficiently specific findings, then the case must be remanded to the trial court with instructions to make the required findings of fact and conclusions of law. ***In re Giorgianna H.***, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006) (citations omitted); ***In re Marr***, 194 S.W.3d 490, 496 (Tenn. Ct. App. 2005) (citations omitted).

From our reading of the final order in this case, the trial court appeared to find five grounds for termination. We discuss each of these in turn.

### Failure to Protect

The trial court's order of termination provided as follows:

8.      This Court has determined by clear and convincing evidence that [Mother] . . . has admitted to . . . failing to protect these children from Johnny Freeman who plead guilty to child rape. . . .

\* \* \*

11.D.   The Court found that Mother knowingly failed to protect her children from the admitted sexual abuse of her live-in-boyfriend, Johnny Freeman. This failure to protect the children from severe abuse constitutes severe abuse.

The trial court failed to cite the statutory ground to which it was referring. Citation of the statutory provision would have been enormously helpful, but its omission is not fatal in and of itself if the remainder of the order is sufficiently specific. Here, we can glean from the language in the order that the trial court was referring to the ground codified at Tennessee Code Annotated § 36-1-113(g)(4), which provides as follows:

The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

T.C.A. § 36-1-113(g)(4) (2005). The definition of severe child abuse in Section 37-1-102 includes: "The commission of any act towards the child prohibited by §§ 39-13-502–39-13-504, 39-13-522,

[7]In this case, the trial court's oral rulings were no more specific than its written order, so examination of the oral ruling would not change the result.

39-15-302, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child." T.C.A. § 37-1-102(b)(21)(C) (2005). The cited statutory sections refer to various types of sexual abuse, including rape, aggravated sexual battery, and rape of a child, all crimes of which Freeman was convicted of committing against K.H. and T.H. We gather from the order that this is the statutory ground on which the trial court relied.

Unfortunately, we can gather little else from the order with respect to Mother's failure to protect the children from Freeman. Freeman's abuse was, of course, admitted and undisputed; however, his parental rights are not at issue in this appeal. Rather, Mother's rights are at issue and she in no way admitted to a knowing failure to protect any of her children from Freeman.

The trial court's "findings of fact" as to Mother's failure to protect are, as in *In re K.N.R.*, little more than "recitations of the statutory grounds" preceded by the phrase "the Court has determined" or "the Court found." *In re K.N.R.*, 2003 WL 22999427, at *4. As noted in *In re K.N.R.*, the prefatory phrase does not transform a conclusion of law into a finding of fact. *Id.*

This is particularly frustrating where the evidence submitted to the trial court, especially from K.H., was clear, detailed and definite, even after a cross-examination that was unexpectedly lengthy and aggressive,[8] given the fact that the witness was a sixteen-year-old girl who undisputedly had been sexually victimized by Mother's boyfriend.[9] Clarity and specificity in the testimony, however, do not substitute for clarity and specificity in the trial court's findings of fact.

We are charged on appeal with reviewing whether the trial court's findings of fact are supported by the preponderance of the evidence, and then determining whether the combined weight of these facts amount to clear and convincing evidence to support the trial court's ultimate factual conclusion. *In re M.J.B.*, 140 S.W.3d at 654. Here, we ask, did the trial court credit *all* of the assertions by K.H. and T.H. and completely discredit Mother's blanket denial? Did the trial court credit only one of the children's assertions? We are "left to wonder on what basis the court reached its ultimate decision" that Mother failed to protect the children from Freeman's abuse.

---

[8]This occurred despite protestations by Mother's attorney, when K.H. began testifying about Freeman's abuse, that "My client does not feel that her daughter should have to go through this again."

[9]The cross-examination by Mother's attorney, Lanis Karnes, even included a gratuitous unflattering reference to the sixteen-year-old witness's weight. After that, during Mother's cross-examination by counsel for Aunt, Betty Scott, the following exchange occurred:

| Q [by Ms. Scott]: | Just for purposes of the record, Ms. Ballard, how tall are you? |
| A: | 5'8, 5'9. |
| Q: | And how much do you weigh? |
| A: | I'm not really sure, 250. |
| | |
| MS. KARNES: | Your Honor, I'm going to object to the relevance. No woman likes to tell that. |

In a parental termination case, in the absence of findings of fact by the trial court, "we cannot simply review the record *de novo* and determine for ourselves where the preponderance of the evidence lies as we would in other civil, non-jury cases." ***In re Adoption of Muir***, 2003 WL 22794524, at *3 (footnote omitted). The trial court must make the findings of fact, not the appellate court. ***See In re K.N.R.***, 2003 WL 22999427, at *3. Therefore, we are left with little choice but to find the trial court's termination order insufficient as to the ground based on Mother's failure to protect.

## Physical Abuse

In its order, the trial court found that "Mother admitted to physically abusing . . . her children prior to incarceration." In her testimony, Mother admitted that she at times had "spanked" the children with a piece of wood, quickly adding that she had learned in a parenting class "that there are many ways to discipline your children other than spanking them." This admission seemed innocuous compared to the assertions by K.H. and T.H., that Mother struck the children on bare skin with wooden door framing, "swinging like you're swinging a bat," while holding them down on the floor with her foot, and that she continued to strike them until they were "crying really, really hard" and begging her to stop. Mother denied these assertions. The children made numerous other allegations against Mother that could be deemed "physical abuse," and Mother denied them all. Was the trial court finding that Mother did *only* what she admitted, *i.e.*, occasionally "spanking" the children with a piece of wood? If so, what was the statutory ground for termination on which the trial court relied?[10] Clearly the trial court's order does not include sufficiently specific findings of fact, or even language from which we can ascertain the statutory ground for termination on which the trial court alludes.

## Failure to Support

The trial court's order states: "Mother admitted to . . . failing to support her children prior to her incarceration." From this language, it appears that the trial court attempted to find that Mother had abandoned her children under Section 36-1-113(g)(1) as defined in Section 36-1-102(1)(A)(iv).[11]

---

[10] It is possible that the trial court was relying on the abandonment provisions, Sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv) ("conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child") or "severe child abuse" under Sections 36-1-113(g)(4) and 37-1-102(b)(21)."

[11] Section 36-1-102(1)(A)(iv) provides:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

(continued...)

This definition is satisfied if, among other things, the parent "is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child" and the parent "has willfully failed to support . . . for four (4) consecutive months immediately preceding such parent's . . . incarceration." The language in the order is insufficient for several reasons. The order did not reference the four-month period prior to Mother's incarceration. Even if it had, there was no evidence at trial corresponding with this finding. The household income while the children lived with Mother and Freeman was apparently comprised of Mother's disability income, Freeman's income from work, and the proceeds of Mother's drug sales. Apart from the abuse suffered by the children, they were housed, clothed and at least minimally fed. The trial court states no facts to support this "finding," and we find none.

### Failure to Contact During Incarceration

The final order also recites the trial court's finding that "[s]ubsequent to incarceration, [Mother] abandoned her children in her failure to have contact with the children to the extent that an inmate is allowed." If this was intended to relate to a statutory ground for termination, the trial court did not cite such a provision, and we have found no statutory ground based on the biological parent's contact with the child during incarceration. Some cases have considered an inmate's attempt to stay in contact during incarceration in connection with the issue of whether termination of the parent's rights is in the best interest of the child. *See In re D.C.A.*, No. M2008-01279-COA-R3-PT, 2009 WL 837877, at *10 (Tenn. Ct. App. Mar. 30, 2009); *In re J.C.J.*, No. E2006-01756-COA-R3-PT, 2007 WL 1215020, at *5 (Tenn. Ct. App. Apr. 25, 2007). We can only presume that this finding relates to the trial court's best interest analysis.

### Wanton Disregard Prior to Incarceration

Finally, the trial court's order states that Mother "willfully abandoned her children based upon her engagement in conduct prior to incarceration which exhibited a wanton disregard for the children. She admitted to physically exposing her children to illegal drug transactions." The language used in the order indicates that the trial court was relying on the statutory ground of abandonment under Section 36-1-113(g)(1), as defined in Section 36-1-102(1)(A)(iv). The child is considered abandoned by the parent if the parent "is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child" and the parent "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." T.C.A. § 36-1-102(1)(A)(iv) (2005).

Here, it is undisputed that Mother was incarcerated at the time the termination proceedings were instituted. More importantly, the trial court made an express factual finding that Mother "admitted to physically exposing her children to illegal drug transactions." This is sufficiently specific to permit this Court to (a) determine if the factual finding is supported by the preponderance of the evidence, and (b) determine whether this factual finding amounts to clear and convincing

---

[11](...continued)
T.C.A. § 36-1-102(1)(A)(iv) (2005).

evidence that Mother engaged in conduct "that exhibits a wanton disregard for the welfare of the [children]." This, then, is the lone ground in the trial court's termination order that satisfies the requirements of Section 36-1-113(k) requiring the trial court to make "specific findings of fact" to support its conclusions. One ground is sufficient to uphold a termination of parental rights. ***In re D.L.B.***, 118 S.W.3d at 367. Therefore, we consider Mother's arguments on appeal as they relate to this statutory ground.

**Jurisdiction**

Mother argues that the Madison County Juvenile Court did not have jurisdiction to terminate her parental rights as to K.H. and S.F. because the Henderson County Juvenile Court exercised emergency jurisdiction over these two children in 2007. We find no support for this assertion in the record, apart from an unexplained comment by the trial court during brief proceedings on August 21, 2007, to the effect that K.H. and S.F. had been taken into state custody and that the trial court did not have jurisdiction over them. Regardless, the issue is moot. During the pendency of this appeal, K.H. reached majority, and the termination of Mother's parental rights as to her is not an issue in this appeal. Further, the Madison County Juvenile Court held the proceedings relating to S.F. in abeyance and did not terminate Mother's parental rights to S.F. because S.F. was in state custody in a therapeutic foster home.

Mother also challenges the finality of the order on the ground that it does not adjudicate the rights of petitioner Dennis Lee Moody, who joined in the petition in order to surrender his parental rights as to K.H. We note that the trial court made the March 10, 2008 order final pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure, finding that there was no just cause for delay. Tenn. R. Civ. P. 54.02. Therefore, this Court has jurisdiction to hear the appeal. Tenn. R. App. P. 3(a). Moreover, since the termination of Mother's rights as to K.H. is not at issue in this appeal, any issues concerning the trial court's failure to adjudicate Moody's parental rights do not impact this appeal.

**Grounds for Termination**

Mother argues that the trial court erred in finding that grounds exist to support the termination of her parental rights. We have already determined that only one of the grounds relied upon by the trial court satisfies the requirements of Section 36-1-113(k), namely, that Mother engaged in conduct prior to her incarceration that exhibited a wanton disregard for the welfare of her children, under Sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv). Therefore, we focus on the evidence as it relates to that ground.

We first address Mother's contention that the final order is insufficient because it did not find that the conduct at issue occurred during the four-month period immediately preceding Mother's incarceration, an element that she argues is required by the definition of abandonment in Section 36-1-102(1)(A)(iv). Section 36-1-102(1)(A)(iv) provides as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has

-14-

been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, *or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child*.

T.C.A. § 36-1-102(1)(A)(iv) (2005) (emphasis added).

In the case of *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court addressed whether pre-incarceration conduct by a biological parent "that exhibits a wanton disregard for the welfare of the child" must occur during the four month period immediately preceding the parent's incarceration. The *Audrey S.* Court noted that prior case law had applied the statute inconsistently, so the Court examined the language and structure of the statute without reference to the prior cases. *Id.* at 868–69.

From the language used in the statute and its structure, the *Audrey S.* Court held that, to be the basis for termination of parental rights, conduct by the biological parent that demonstrates a wanton disregard for the welfare of the child does not have to occur during the four month period immediately preceding the parent's incarceration. *Id.* at 871. We agree with the analysis of the *Audrey S.* Court on this issue. Therefore, we hold that the trial court was not required to find that Mother's conduct demonstrating a wanton disregard for the welfare of the children took place during the four months immediately preceding her incarceration, in order to serve as the basis for the trial court's conclusion that Mother abandoned her children as defined in Section 36-1-102(1)(A)(iv).

The trial court found that Mother exposed her children to illegal drug transactions, and that this constituted conduct exhibiting a wanton disregard for the welfare of her children. Mother denies, however, that her conduct exhibited a wanton disregard for the welfare of her children, contending that the children's removal from her custody resulted from "conditions . . . not caused by . . . Mother." She minimizes her arrest for trafficking in illegal drugs with the children accompanying her by characterizing the conduct as "a violation of probation." This Court has previously held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867–68 (citing *DCS v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7–8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d 467, 474–75 (Tenn. Ct. App. 2000)).

Mother clearly admitted that she brought the children with her while she sold drugs. Moreover, the record is replete with evidence that Mother sold drugs out of the home that she shared with the children and that the children were integrally involved in her drug transactions, to the point that they were recruited to count the hydrocodone pills that she sold. The testimony of K.H. and T.H. demonstrated the children's troubling level of knowledge of drug terminology and usage.

Based on the record, it is clear that the trial court's finding that Mother exposed her children to illegal drug transactions is supported by a preponderance of the evidence. This constitutes conduct exhibiting a wanton disregard for the welfare of the children under Tennessee Code Annotated § 36-1-102(1)(A)(iv). Accordingly, we find no error in the trial court's conclusion that grounds exist to terminate Mother's parental rights.

## Best Interest

Finally, Mother argues that termination of her parental rights is not in the best interest of the children. Tennessee Code Annotated § 36-1-113(i) lists the factors to be considered.[12] The court is not required to analyze each factor in order to determine that terminating a parent's rights is in the best interest of the children. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citing *State*

----

[12]The statute's non-exhaustive list of factors is as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2005).

***v. T.S.W.***, No. M2001-01735-COA-R3-JV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002)).

Mother notes that, since being in prison, she has completed her G.E.D. as well as several other parenting and anger management courses. She claims that she has a meaningful relationship with all of her children, that she was unaware of Freeman's sexual abuse of the children, and that upon her release from prison, she will have a job and a place to live. She argues that the evidence does not support the trial court's finding that termination of her parental rights is in the best interest of her children.

Mother's efforts at self-improvement are to be applauded. Unfortunately, they are far too little, far too late. The trial court found, and Mother admitted, that she exposed her children to illegal drug transactions and that she physically abused her children. The court also noted that Mother is currently serving a twenty-two year prison sentence for the drug transactions and the prior facilitation of murder conviction. These findings are supported by undisputed evidence.

The record also shows that Mother recruited K.H. and T.H. to leave their home with Grandmother and Aunt, promising them that she would be the best mother they ever had. However, instead of providing a loving home for them, the record shows that Mother essentially made the girls into household servants, actively humiliated and abused them, and indeed put them in fear for their lives and those of their sisters. Despite Mother's disavowal of any knowledge of sexual abuse, the record shows that, to the contrary, she stood by as Freeman and other sexual predators tormented her daughters and threatened their safety and that of their sisters. Mother's failure to take responsibility for her actions only magnifies the resulting harm to the children.

"Few consequences of judicial action are so grave as the severance of natural family ties." ***Santosky v. Kramer***, 455 U.S. 745, 787 (1982). It is not a decision to be taken lightly. However, on this record, clear and convincing evidence compels affirmance of the trial court's conclusion that termination of Mother's parental rights is in the best interest of K.H., A.F., and W.F.

## CONCLUSION

The decision of the trial court is affirmed. The costs of this appeal are taxed to the Appellant Tanya Dee Ballard and her surety, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE

-17-